UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

ROSE C. COIA,

                              Plaintiff,

                    v.                              09-CV-0236-A

MICHAEL J. ASTRUE,
Commissioner of Social Security,

                              Defendant.
_____

## INTRODUCTION

Plaintiff Rose C. Coia commenced the current action on March 13, 2009, pursuant to 42 U.S.C. § 405(g), seeking review of a final determination made by the Defendant, Michael J. Astrue, the Commissioner of Social Security (Commissioner). Plaintiff claims disability due to depression, a learning disability, and left wrist pain. The Commissioner and plaintiff filed motions for judgment on the pleadings, pursuant to Fed. R. Civ. P. 12(c), on July 28, 2009 and November 30, 2009, respectively.

For the reasons herein, the Commissioner's motion for judgment on the pleadings is granted and plaintiff's motion for judgment on the pleadings is denied.

## BACKGROUND

Plaintiff first filed an application for supplemental security income (SSI) benefits on April 11, 2002. This application was denied and a hearing was requested before an Administrative Law Judge (ALJ), which was granted. The ALJ submitted a final decision on May 27, 2004 that denied SSI benefits to plaintiff.

Plaintiff, who was fifty-four years old at the time, again filed for SSI benefits on January 18, 2006, with a modified onset date of March 14, 2005.  The application was initially denied and a hearing before an ALJ was requested.  The hearing was held on May 21, 2008 and the ALJ issued a decision denying plaintiff SSI benefits on July 15, 2008.  The Appeals Council denied plaintiff's request for review and the ALJ's decision became final.  Plaintiff then timely commenced this action.

Plaintiff seeks SSI benefits due to depression, a learning disability, and pain in her left wrist.  Her left wrist injury was caused by a slip on ice on March 8, 2005, which resulted in a fracture in her left wrist and left ring finger.  Plaintiff was examined by a number of physicians relating to her wrist and hand injury.  First, plaintiff saw James Kelly, D.O. on May 17, 2005 (Tr. 332).  Dr. Kelly estimated that she would be able to return to work within two months.  Plaintiff returned to Dr. Kelly on October 11, 2005, who remarked that she was not recovering as quickly as he had originally hoped.  Dr. Kelly opined that she remained "totally disabled," due to her left wrist injury, and estimated that plaintiff could return to work in five to seven weeks (Tr. 337).   Plaintiff saw Christine Holland, M.D. for her hand.  Dr. Holland opined that plaintiff would have problems with heavy lifting and moderate limitations regarding repetitive or prolonged use of her left hand.  Plaintiff was examined by Mohammad Jaffri, M.D. on March 14, 2006 (Tr. 358-61).  Dr. Jaffri reported that plaintiff's finger and hand dexterity were intact and only slightly reduced grip strength was noticed.  Dr. Jaffri noted that she would have moderate limitations with lifting and carrying weights, as well as pulling and pushing activities.

Plaintiff underwent an x-ray and diagnostic testing on July 18, 2007 and March 27, 2006, respectively (Tr. 567, 525-30). These tests suggested that plaintiff was afflicted with scoliosis, mild degenerative discogenic changes, and degenerative joint changes of the right facet at L3-L4. The bone density in her spine, hips, and right forearm all appeared normal.

Plaintiff has an extensive history of illegal drug and alcohol abuse. She began drinking alcohol and using marijuana when she was twelve years old (Tr. 297). She began to use cocaine in 1996. Currently, plaintiff claims that she has ceased using marijuana and cocaine, but will occasionally drink alcohol to excess on weekends (Tr. 609-10). In 2006, plaintiff attended a drug treatment program at Horizon Health Services (Tr. 421-67). She had five times previously been in outpatient chemical dependency treatment programs (Tr. 424).

Plaintiff has a sparse work record and little formal education. She attended high school through ninth grade, when she left due to attendance and tardiness problems (Tr. 289). Plaintiff received some vocational training in 2000, but has not made an attempt to return to any vocational program since that time (Tr. 613). When questioned by the ALJ, plaintiff said that she did not know whether she wanted to get a job (Tr. 613). She was last employed as a laborer in 2005, until leaving due to her hand injury (Tr. 211).[1]

---

[1] There is some inconsistency in the record regarding the dates associated with plaintiff's injury and when she stopped working. Plaintiff slipped on ice and injured her wrist on March 8, 2005. At her hearing before the ALJ, plaintiff mentioned that she hurt her wrist, "On the ice, going to work" (Tr. 600). Plaintiff's attorney also noted that "she definitely worked up until the fall" (Tr. 608). Notwithstanding the remarks of plaintiff and her counsel at the hearing, plaintiff filed several forms stating that her last day of work was either February 27, 2005 or February 28, 2005 (Tr. 74, 200, 211).

In addition to little formal education, plaintiff suffers from a history of depression and below average intelligence. In 1997, she was prescribed Desipramine, an antidepressant, but has failed to take the medication regularly (Tr. 248). She attempted suicide on one occasion in 2005 (Tr. 353-54).

Plaintiff was extensively examined by mental health professionals. An IQ test performed in 2002 revealed that plaintiff has a verbal IQ of 72, performance IQ of 68, and full scale IQ of 67, which classifies her as mildly mentally retarded (Tr. 116). Plaintiff was examined by Dr. Thomas Dickinson on September 13, 2005, who concluded that plaintiff is able to understand and remember basic job directions and specific job duties and perform repetitious tasks with mild supervision (Tr. 289-96). Next, plaintiff was examined by Dr. M. Totin on October 12, 2005 (Tr. 311-324). Dr. Totin's notes indicate that plaintiff has only mild limitations in her daily living activities and maintaining concentration and moderate limitations in social functions. Then, plaintiff was given a psychiatric evaluation by Dr. Renee Baskin on March 14, 2006 (Tr. 353-58). In Dr. Baskin's opinion, plaintiff can follow and understand simple directions and instructions and perform simple tasks with supervision, but has some difficulty maintaining concentration, attention, learning new tasks, and making a schedule. Finally, non-examining psychiatric consultant Dr. Cheryl Butensky assessed plaintiff on May 11, 2006 (Tr. 392-410). Dr. Butensky's notes report that plaintiff could work in a low stress and low contact environment and that plaintiff is not significantly limited in her ability to maintain socially appropriate behavior.

The ALJ, in his July 15, 2008 decision, found that plaintiff has severe impairments: mental retardation, an affective disorder, and degenerative joint disease

(Tr. 20). Despite these impairments, the ALJ determined that plaintiff had the residual functional capacity to perform light work, with only a few limitations (Tr. 22). Based on plaintiff's residual function capacity, and taking into account her limitations, the ALJ found that plaintiff could perform work that exists in significant numbers in the national economy (Tr. 24). Specifically, she could work as either a photofinishing counter clerk or a surveillance systems monitor (Tr. 24).

## DISCUSSION

I.      Jurisdiction and Scope of Review

This Court has jurisdiction pursuant to 42 U.S.C. § 405(g), with 42 U.S.C. § 1383(c)(3) incorporating judicial review for SSI purposes. The scope of review of the Commissioner's decision is limited by statute. This Court reviews the Commissioner's final decision only to ensure it is based upon correct legal standards and is supported by substantial evidence in the record as a whole. Substantial evidence is "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971) (internal quotation marks omitted) (quoting Consol. Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)). If the Commissioner's final decision is based upon correct legal standards and substantial evidence, it must be upheld. 42 U.S.C. § 405(g); Perez v. Chater, 77 F.3d 41, 46 (2d Cir. 1996).

II.     The ALJ properly followed the five step evaluation process in determining whether plaintiff was entitled to SSI benefits.

The evaluation of whether an individual is entitled to SSI benefits follows a five-step evaluation process.

> At the first step, we consider your work activity, if any. If you are doing substantial gainful activity, we will find that you are not disabled.
>
> At the second step, we consider the medical severity of your impairment(s). If you do not have a severe medically determinable physical or mental impairment that meets the duration requirement . . . or a combination of impairments that is severe and meets the duration requirement, we will find that you are not disabled.
>
> At the third step, we also consider the medical severity of your impairment(s). If you have an impairment(s) that meets or equals one of our listings . . . and meets the duration requirement, we will find that you are disabled.
>
> At the fourth step, we consider our assessment of your residual functional capacity and your past relevant work. If you can still do your past relevant work, we will find that you are not disabled.
>
> At the fifth and last step, we consider our assessment of your residual functional capacity and your age, education, and work experience to see if you can make an adjustment to other work. If you can make an adjustment to other work, we will find that you are not disabled. If you cannot make an adjustment to other work, we will find that you are disabled.

20 C.F.R. § 416.920(a)(4)(i)-(v).

The ALJ followed this five step sequential analysis and found at the first step that plaintiff has not been substantially employed since January 18, 2006, the date of her application for SSI benefits (Tr. 20). 20 C.F.R. § 416.920(b). At step two, the ALJ found that plaintiff has severe impairments: mental retardation, an affective disorder, and degenerative joint disease (Tr. 20). 20 C.F.R. § 416.920(c). Plaintiff's IQ was tested in May of 2002, which indicated that plaintiff was in the mentally retarded range of intellectual functioning (Tr. 20). The tests indicated that she has a Verbal IQ of 72, Performance IQ of 68, and a Full-Scale IQ of 67 (Tr. 20). Plaintiff was assessed by Dr. Renee Baskin and Dr. Thomas Dickinson, both of whom diagnosed her with a depressive disorder, which led to the finding that plaintiff has an affective disorder.

Finally, the ALJ's finding that plaintiff is afflicted with a degenerative joint disease is based on the medical opinions of Dr. Christine Holland and Dr. Mohammad Jaffri and x-ray results (Tr. 20-21).

Evaluating plaintiff at step three, the ALJ found that, although plaintiff has severe impairments, she does not have an impairment, or combination of impairments, that meets or equals those listed in 20 C.F.R. § 404, Subpart P, Appendix 1.

At step four, the ALJ determined that plaintiff does not have any relevant past work experience. 20 C.F.R. § 416.920(e). Therefore, there was no need to consider whether plaintiff's impairments prevented her from performing past work (Tr. 23-24).

At the final step, the ALJ found that plaintiff has the residual functional capacity to perform light work, with the exception that she can only occasionally perform fine fingering and gross handling, she cannot work at assembly line pace, and she can only occasionally deal with the public, supervisors, and co-workers (Tr. 22). 20 C.F.R. § 416.920(g). Also, after considering plaintiff's age, education, work experience, and residual functional capacity, the ALJ concluded that a significant number of jobs exist in the national economy that plaintiff can perform (Tr. 24). Specifically, the ALJ mentioned that plaintiff could work as a photofinishing counter clerk or a surveillance systems monitor (Tr., 24).

III.   <u>The ALJ properly evaluated evidence of plaintiff's wrist impairment.</u>

Plaintiff asserts that the ALJ erred by failing to give controlling weight to the statement of her treating physician, Dr. James Kelly, who opined in October 2005 that plaintiff was "totally disabled" as a result of her wrist injury (Tr. 337). The ALJ's decision was based on an inconsistency between the treating physician's opinion and other

7

medical evidence in the record, including diagnostic imaging, electromagnetic testing, other medical opinions, and Dr. Kelly's own findings.  Here, Dr. Kelly's opinion that plaintiff was totally disabled conflicted with the opinions of Dr. Jaffri and Dr. Holland, who both reported that plaintiff could work, with some moderate limitations (Tr. 361, 300).  Moreover, after examining plaintiff on October 11, 2005, Dr. Kelly's own findings suggest that plaintiff would be released for work duties only five to seven weeks after he remarked that she was "totally disabled" (Tr. 337).  With such a short period, only five to seven weeks, between Dr. Kelly's assessment that plaintiff was "totally disabled" and when he believed she would be ready for work, plaintiff could not be considered disabled, within the statutory definition, at that time.  42 U.S.C. § 423(d)(1)(a) ("The term 'disability' means – inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to . . . *last for a continuous period of not less than 12 months*[.]") (emphasis added).  Where, as here, the opinion of the treating physician conflicts with other evidence, the ALJ need not give the opinion controlling weight.   20 C.F.R. § 416.927; See Zabala v. Astrue, 595 F.3d 402, 409 (2d Cir. 2010).  Moreover, the final decision as to whether a claimant is disabled is reserved for the Commissioner.  20 C.F.R. § 416.927(e)(1).

Plaintiff argues that the ALJ substituted his own judgment for that of a competent medical opinion.   However, the allegation is without merit.  The ALJ's decision is based upon the medical opinions in the record.  A vast majority of the physicians that examined plaintiff believed that she was capable of working, with a few limitations.  After examining plaintiff on October 11, 2005, Dr. Kelly's reported that plaintiff would be able to return to work within five to seven weeks (Tr. 332).  Dr. Holland assessed plaintiff's

grip strength to be diminished to only 4/5 (Tr. 299). She opined that plaintiff could return to work, but would have limitations with heavy lifting and prolonged or repetitive use of her hand. Dr. Jaffri noted that plaintiff's finger dexterity was nearly intact and that she could work, but with limitations regarding lifting and carrying weights (Tr. 360-61). The medical opinions in the record are substantial evidence that support the ALJ's decision. 42 U.S.C. § 405(g); Richardson, 402 U.S. at 401.

Plaintiff alleges that the ALJ improperly dismissed her credibility. The ALJ deemed plaintiff not credible due to her ongoing alcohol abuse and past cocaine use, (Tr. 23), and gave little weight to plaintiff's subjective complaints. Deference is given to the ALJ's decision because he is in the best position to assess plaintiff's credibility. See Snell v. Apfel, 177 F.3d 128, 135 (2d Cir. 1999). Additionally, in order to further determine plaintiff's credibility, the ALJ took her past work record into consideration and made a judgment about plaintiff's motivation to work. See Schaal v. Apfel, 134 F.3d 496, 503 (2d Cir. 1998) ("[T]he ALJ did not commit legal error by taking account of plaintiff's limited work history as one factor in assessing the credibility of her testimony regarding her symptoms."). The ALJ properly made a determination about plaintiff's credibility and the weight which could be assigned to her subjective comments.

IV.     The ALJ fully explained and accounted for all of plaintiff's mental limitations.

Plaintiff next contends that the ALJ failed to fully account for her mental limitations. She points to the fact that she continually received Global Assessment of Functioning (GAF) scores of 55 from her treating psychiatric provider and that the opinions of several of the consultative examiners are consistent with such an assessment. A GAF score of 55 suggests that plaintiff would have "[m]oderate

9

symptoms . . . OR moderate difficulty in social, occupational, or school functioning."
AMERICAN PSYCHIATRIC ASSOCIATION, DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL
DISORDERS 34 (4th ed. 2004).[2]  Contrary to plaintiff's contention, there is substantial evidence in the record that suggests that the ALJ accounted for plaintiff's low GAF score when he gave his decision.  42 U.S.C. § 405(g); Richardson, 402 U.S. at 401.

First, when the ALJ examined the vocational expert he noted that any work plaintiff performed must require only "[o]ccasional dealing with public, supervisors, and coworkers" (Tr. 615).  This stipulation takes into account plaintiff's low GAF score and the "[m]oderate difficulty in social [and] occupational . . . functioning" that plaintiff would experience.  The ALJ also accounted for plaintiff's mental limitations within his decision.  He noted that plaintiff is afflicted with an affective disorder, a severe impairment (Tr. 20), and that she has been reported by medical opinions to be irritable, depressed, dysphoric, and anxious (Tr. 21).  Furthermore, the ALJ's decision explains that plaintiff's mental limitations result in moderate limitations in daily living activities, maintaining social functioning, and maintaining concentration, persistence, or pace (Tr. 22).  The ALJ specifically mentioned that he "considered these limitations" in issuing his decision (Tr. 22).  Despite all of plaintiff's limitations, the ALJ still found that she has the residual functional capacity to work in the national economy and therefore is not disabled (Tr. 24).  His decision denying SSI benefits clearly accounts for plaintiff's mental limitations.

---

[2] Plaintiff's brief notes that a GAF score of 55 indicates that an individual would have "*serious* symptoms or any *serious* impairment in social, occupational, or school functioning" (emphasis added) (Docket Entry 14 at 16). However, that assessment of symptoms does not properly correspond to a GAF score of 55.  A score of 55 would suggest that an individual would experience "[m]oderate symptoms . . . OR moderate difficulty in social, occupational, or school functioning." AMERICAN PSYCHIATRIC ASSOCIATION, DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS 34 (4th ed. 2004).  Plaintiff's brief describes an individual that was assessed to have a GAF score of 41-50.

Plaintiff challenges the ALJ's failure to accord controlling weight to the opinion of her treating psychiatric provider Ann Marie Pasek, a nurse practitioner (Tr. 390, 447, 50, 53, 56, 59, 62). To establish a medical impairment an individual needs evidence from an "acceptable medical source." Acceptable medical sources are defined by 20 C.F.R. § 404.1513(a) as (1) licensed physicians, (2) licensed or certified psychologists, (3) licensed optometrists, (4) licensed podiatrists, and (5) qualified speech-language pathologists. See 20 C.F.R. § 404.1502. Plaintiff's treating psychiatric source was a nurse practitioner. Nurse practitioners are allowed to establish the severity of an impairment, 20 C.F.R. § 404.1513(d)(1), but are not listed among the health professionals that are deemed "acceptable medical source[s]" in order to establish an impairment. While the ALJ was required to give the nurse practitioner's opinion some weight, he was not required to accord it controlling weight. See Kohler v. Astrue, 546 F.3d 260, 268 (2d Cir. 2008) ("[The ALJ] should have given [the nurse practitioner's] opinion *some consideration*, particularly because [she] was the only medical professional available . . . for long stretches of time[.]") (emphasis added); Bowman v. Astrue, 511 F.3d 1270, 1275 n. 2 (10th Cir. 2008) (Further, "only 'acceptable medical sources' can give . . . medical opinions" and "be considered treating sources . . . whose medical opinions may be entitled to controlling weight." (quoting SSR 06-03p, 2006 SSR LEXIS 4, 2006 WL 2329939 at *2)) (noting further that a source that is not an "acceptable medical source" deserves some weight and may outweigh the opinion of an "acceptable medical source"); Lacroix v. Barnhart, 465 F.3d 881, 887 (8th Cir. 2006) (mentioning that nurse practitioners are specifically listed as "other" medical sources and not "acceptable medical sources"); Tejada v. Apfel, 167 F.3d 770, 775 (2d Cir.

1999) (noting that a podiatrist's opinion should be given some weight, but not controlling weight because "podiatrist" is not listed as an "acceptable medical source" ). There is substantial evidence in the record that the ALJ properly gave some weight to the opinion of plaintiff's treating psychiatric source.

Finally, assuming arguendo that the treating psychiatric provider's opinion would be entitled to controlling weight, it would not lead to the conclusion that plaintiff should be found disabled and entitled to SSI benefits. The treating source notes that plaintiff is afflicted with a GAF score of 55, depression, and alcohol abuse, but never mentioned that she is unable to perform work related activities (Tr. 447-64). At plaintiff's hearing, the ALJ asked whether there was "any statement that [her] psychological impairments prevented her from working" (Tr. 600). Plaintiff's attorney replied, "By her treating source, no" (Tr. 600). Moreover, other evidence of plaintiff's mental health condition supports the conclusion that she can work. Dr. Dickinson and Dr. Baskin noted that plaintiff could follow and understand basic job directions, with only mild supervision, could maintain attention and concentration for job assignments, and could remember and perform specific job duties (Tr. 294, 353-55). Dr. Butensky also opined that plaintiff could work in a low stress environment (Tr. 409).

Plaintiff further alleges that the ALJ did not adequately account for plaintiff's below average intelligence and the way that would affect her ability to perform work related tasks. An IQ test performed in 2002 revealed that plaintiff has a verbal IQ of 72, performance IQ of 68, and full scale IQ of 67 (Tr. 116). Additionally, she has received very little formal education. She completed school through the ninth grade and received some vocational training in 2000 (Tr. 289, 613). Notwithstanding plaintiff's suggestions,

the record contains substantial evidence that the ALJ considered plaintiff's below average intelligence when he rendered a decision.  42 U.S.C. § 405(g); Richardson, 402 U.S. at 401.

At plaintiff's hearing before the ALJ, all parties were aware of, and accounted for, plaintiff's below average intellectual functioning abilities (Tr. 615).  After an exchange with plaintiff's attorney, regarding plaintiff's exact IQ scores and level of mental functioning, the ALJ asked the vocational expert whether there was work that plaintiff could perform that only required her to understand "[s]imple tasks, simple instructions" (Tr. 615).  Additionally, the vocational expert was questioned by plaintiff's attorney as to whether someone like plaintiff, with a sixth grade reading level, could perform job related functions (Tr. 621).  The vocational expert testified that she worked primarily in helping to place and find jobs for people with mental retardation and that she believed plaintiff could perform specific job related tasks (Tr. 621).

V.     The ALJ did not commit an error by relying on vocational expert's testimony.

Finally, plaintiff contends that the ALJ erred in relying on the testimony of the vocational expert, who offered two jobs that plaintiff could perform:  photofinishing counter clerk (DOT code 249.366-010)[3] and surveillance systems monitor (DOT code 379.367-010).[4]  Plaintiff argues that the photofinishing clerk job is not appropriate

---

[3] **Receives film for processing, loads film into equipment that automatically processes film for subsequent photo printing, and collects payment from customers of photofinishing establishment: Answers customer's questions regarding prices and services. Receives film to be processed from customer and enters identification data and printing instructions on service log and customer order envelope. Loads film into equipment that automatically processes film, and routes processed film for subsequent photo printing. Files processed film and photographic prints according to customer's name. Locates processed film and prints for customer. Totals charges, using cash register, collects payment, and returns prints and processed film to customer. Sells photo supplies, such as film, batteries, and flashcubes.**

[4] **Monitors premises of public transportation terminals to detect crimes or disturbances, using closed circuit television monitors, and notifies authorities by telephone of need for corrective action: Observes television screens that transmit in sequence views of transportation facility sites. Pushes hold button to maintain surveillance of location where incident is developing, and telephones police or other designated agency to notify**

because it requires interaction with people for a majority of the day. Approximately one-third of the day is spent interacting with the public and another one-third of the day is consumed by interactions with co-workers and supervisors. However, the vocational expert noted that plaintiff would be able to adequately perform the job even with the level of interaction that is required and medical opinion evidence supports this conclusion. See, e.g., Tr. 394 (opinion of Dr. Cheryl Butensky, which shows the plaintiff's ability to maintain socially acceptable behavior is not significantly limited). There are a significant number of jobs in the national economy that plaintiff could perform.[5] In any event, there was ample evidence that plaintiff could perform the position of surveillance systems monitor.

Based on the record, the ALJ correctly decided that plaintiff had the residual functional capacity to work and that a significant number of positions exist within the national economy that plaintiff could occupy.

## **CONCLUSION**

For the foregoing reasons, the Court finds that substantial evidence supports the ALJ's determination that plaintiff is not disabled. Accordingly, the Commissioner's motion for judgment on the pleadings is granted and plaintiff's motion for judgment on the pleadings is denied.

---

authorities of location of disruptive activity. Adjusts monitor controls when required to improve reception, and notifies repair service of equipment malfunctions.

[5] Plaintiff notes that there are not as many photofinishing counter clerk jobs today as there were in 1986, when the DOT job description was created, due to the advent of digital photography. The vocation expert testified, based on the DOT job description, that there were 93,500 jobs nationally and 1,640 jobs regionally (Tr. 617). The loss incurred by this market, however, is minimal. The vocational expert estimated that home digital photography would only reduce the number of jobs available by less than one-third (Tr. 623). This leaves a significant number of photofinishing clerk jobs in the national economy that plaintiff could perform. In any event, plaintiff can perform the job of surveillance systems monitor. There are 188,000 jobs nationally and 1,255 jobs regionally within this profession (Tr. 617).

SO ORDERED.

                                          *s/ Richard J. Arcara*
                                          HONORABLE RICHARD J. ARCARA
                                          UNITED STATES DISTRICT JUDGE

DATED: August 6, 2010